## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| STATE OF TENNESSEE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.: 3:10-CV-467 |
| | ) | (VARLAN/SHIRLEY) |
| ROANE HOLDINGS LIMITED, *et al.*, | ) | |
| | ) | |
| Defendants/Third-Party Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| CITIGROUP INC., *et al.* | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on three motions to dismiss the third-party

complaint (the "TPC"), pursuant to Federal Rule of Civil Procedure 12(b)(6), and submitted

on behalf of the third-party defendants (collectively "defendants"): MeadWestvaco

Corporation's ("MeadWestvaco") motion to dismiss [Doc. 14]; Union Carbide Corporation's

("UCC") motion to dismiss [Doc. 24]; and Citigroup Inc.'s ("Citigroup") motion for partial

dismissal [Doc. 27]. Defendants and third-party plaintiffs, Roane Holdings Limited and

Commercial Development Co., Inc. ("plaintiffs"), have responded in opposition [Doc. 38].

MeadWestvaco and Citigroup have filed a reply brief [Doc. 41], as has UCC [Doc. 43].[1]

---

[1]The motions to dismiss involve only claims alleged in the TPC by defendants and third-party plaintiffs and against third-party defendants. Thus, for ease of reference, the Court will refer to defendants and third-party plaintiffs as "plaintiffs," and will refer to third-party defendants as "defendants."

For the reasons set forth herein, the motions to dismiss will be granted in part and denied in part.

I.     **Facts**

According to the TPC, beginning in the 1950s, facilities constructed at the Roane Alloys Site in Rockwood, Tennessee (the "Site"), were used to process ore into ferroalloys used in the production of stainless steel, including ferrochrome, ferromanganese, and feresilicon alloys [Doc. 9, ¶ 7]. Tennessee Products and Chemical Corporation operated the Site from 1956 through September 1969, with ferroalloy production at the facilities on the Site being under lease to UCC from October 1964 through September 1969 [*Id.*, ¶ 8]. In 1969, ferrochrome alloy production at the Site ceased while ferromanganese alloy and ferrosilicon alloy production continued [*Id.*, ¶ 9].

The Mead Corporation ("Mead"), a predecessor to MeadWestvaco, purchased the Site in October 1969 and operated it until around 1974 [*Id.*, ¶ 10]. In May 1973, air pollution control equipment was installed on the Site [*Id.*, ¶ 11]. Sometime thereafter, Mead became MeadWestvaco [*Id.*, ¶ 13]. Through a July 1974 purchase agreement, the Site was sold to a predecessor of Citigroup, Engelhard Minerals and Chemical Corporation ("Engelhard"), who owned and operated the Site through a wholly-owned subsidiary [*Id.*, ¶ 12]. Sometime thereafter, Engelhard became Philipp Brothers, Inc., which merged with Salomon, Inc., which, in turn, became a part of Citigroup [*Id.*, ¶ 15].

Between 1956 and 1982, the production of the ferroalloys at the Site "produced wastes including various slags" which were "stockpiled" on the Site [*Id.*, ¶¶ 17, 19]. Baghouse dust

2

generated from the air pollution equipment installed in 1973 were also stockpiled on the Site until 1982, when operations at the Site ceased [*Id.*, ¶ 18]. Various decommission activities also occurred at the Site after operations ceased [*Id.*, ¶ 19]. In March 1987, the Tennessee Department of Health and Environment (the "TDHE"), investigated the Site following complaints about discoloration and high pH in Cardiff Creek [*Id.*, ¶ 20]. In May 1987, testing of baghouse dust disposed of at the Site between 1973 and 1982 revealed high concentrations of lead [*Id.*, ¶ 21]. According to the TPC, 8.1% of the baghouse dust at the Site was generated by MeadWestvaco's predecessor; 67.4% was generated by Citigroup's predecessor; and 24.5% was generated by plaintiffs' predecessor [*Id.*].

In 1989, the Site was placed on the Tennessee List of Inactive Hazardous Substances Sites [*Id.*, ¶ 24]. In 1992, based on the results of a remedial investigation/feasibility study completed in 1991 (the "RI/FS"), a record of decision ("ROD") was issued which contained remedial measures for the Site [*Id.*, ¶¶ 25, 26]. In February 2003, the Tennessee Department of Environmental Conservation's (the "TDEC's") division of water pollution control and superfund sampled surface water and sediment in Cardiff Creek, at a location downstream from the Site [*Id.*, ¶ 28]. Based on that sampling, in March 2003, the Tennessee Division of Superfund (the "TDSF") requested that a plan be developed to reduce the migration of contaminated water into Cardiff Creek and to increase the frequency of surface water and pH monitoring [*Id.*, ¶ 29]. In April and May 2003, plaintiffs' predecessor and environmental contractors conducted additional site characterization activities [*Id.*, ¶ 30]. In July 2003,

plaintiffs' predecessor presented TDSF with an interim action plan proposing a second phase of site characterization activities [*Id.*, ¶ 30].

In January 2009, plaintiffs, through environmental contractors, submitted a revised remedial design report to the TDEC (the "January 2009 RD") [*Id.*, ¶ 32]. In June 2009, plaintiffs entered into an Administrative Consent Order (the "AOC") with the State of Tennessee and the TDEC to complete remedial activities outlined in the January 2009 RD [*Id.*, ¶ 33]. In November 2010, the State of Tennessee filed suit against plaintiffs pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.* ("CERCLA") [Doc. 1]. On December 10, 2010, plaintiffs entered into a Consent Decree with the State of Tennessee and the TDEC to ensure the payment of response costs resulting from releases and threatened releases of hazardous substances at the Site [*Id.*, ¶¶ 34-35; Doc. 7]. On December 17, 2010, the Court judicially entered the Consent Decree in the record of this case [Doc. 9, ¶ 34; Doc. 7].

In February 2011, plaintiffs filed the TPC against defendants, seeking recovery of costs plaintiffs claim to have incurred and will continue to incur in connection with environmental impacts and response actions at the Site [Doc. 9]. The TPC asserts three counts against all defendants under CERCLA. Count I is a cost-recovery claim based on plaintiffs' activities in relation to the AOC and pursuant to § 107(a)(4) of CERCLA, *id.* § 9607(a)(4). Count II is a contribution claim based on the Consent Decree and pursuant to § 113(f)(1) and § 113(f)(3)(B) of CERCLA, *id.* § 9613(f)(1), § 6613(f)(3)(B). Count III is a claim for declaratory relief based on plaintiffs' cost-recovery and contribution claims in

4

Counts I and Count II and pursuant to § 113(g)(2) of CERCLA, *id.* § 9613(g). Plaintiffs also assert an indemnification claim against Citigroup in Count IV.[2] Plaintiffs assert that they have incurred over $12.6 million in response costs and that they will continue to incur response costs related to response activities at the Site under the AOC and the Consent Decree, including attorneys fees and expenses [*Id.*, ¶¶ 36, 37]. Plaintiffs submit that Citigroup, and its predecessors, and MeadWestvaco, and its predecessors, partially reimbursed plaintiffs' response costs from 1990 to 1997, and 2005, respectively [*Id.*, ¶¶ 39, 42]. Plaintiffs assert that UCC has not reimbursed plaintiffs for any response costs [*Id.*, ¶ 38].

## II.     Standard of Review

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must construe the complaint in a light most favorable to the plaintiff and accept all the factual allegations as true. *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Viiage Sch. Dist.*, 428 F.3d 223, 228 (6th Cir. 2005); *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002). In doing so, the Court must "draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Yet, the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000).

---

[2]In is motion for partial dismissal, Citigroup has not moved to dismiss Count IV, plaintiffs' indemnification claim against Citigroup, or provided any argument pertaining to that claim. Accordingly, this order does not address Count IV.

Thus, this standard of review requires more than the bare assertion of legal conclusions. *Lillard v. Shelby Cnty Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996). "[A] plaintiff's obligation to provide the 'grounds of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to rase a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949-50 (2009). Further, the complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on different grounds by *Twombly*). In application, a "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Lillard*, 76 F.3d at 726 (citation omitted). The Court cannot grant a motion to dismiss under Rule 12(b)(6) based upon a disbelief of a complaint's factual allegations. *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1138 (6th Cir. 1995).

## III.    Analysis

Defendants' motions to dismiss all raise the same basic arguments, with some exceptions. First, defendants argue that plaintiffs' CERCLA claims rest on conclusory statements, insufficient facts, and mere "labels and conclusions" which fail to plead any plausible claims for relief under CERCLA. Second, defendants argue that plaintiffs are precluded from bringing Count I, plaintiffs' claim for cost-recovery pursuant to § 107(a)(4)

6

of CERCLA, 42 U.S.C. § 9607(a)(4).  Third, defendants argue that plaintiffs' claim for declaratory relief in Count III is derivative of Counts I and II and should be dismissed. Fourth, UCC argues that plaintiffs' CERCLA claims against them are barred in part by the applicable statute of limitations.  Plaintiffs oppose all of defendants' arguments.

## A.    CERCLA Cost-Recovery and Contribution Framework

CERCLA facilitates cleanup costs and remediation of contaminated sites and shifts the financial burden of such environmental response actions to the parties potentially responsible for releasing hazardous substances.  *ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 456 (6th Cir. 2007) (citations omitted).  CERCLA provides two distinct remedies by which potentially responsible parties ("PRPs") may recover some or all of their hazardous waste cleanup costs: (1) cost-recovery claims pursuant to § 107(a), 42 U.S.C. § 9607; and (2) contribution claims pursuant to § 113(f), *id.* § 9613.  The first option, § 107(a), provides that PRPs are liable for "any . . . necessary costs of response incurred by any other person" consistent with CERLCA.  *Id.* § 9607(a)(4)(B).  Thus, § 107(a) allows private parties to bring cost-recovery suits against other PRPs.  *ITT Indus.*, 506 F.3d at 456.

Congress provided the language necessary to authorize contribution under CERCLA when it added § 113 to the statutory scheme with the passage of the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, *et seq.* ("SARA").  Thus, § 113(f) is the second means of recouping response costs under CERCLA.  *Id.* § 9613(f).  The distinction between a claim pursuant to § 107(a) and a claim pursuant to § 113(f) is that a defendant in a § 107(a) cost-recovery action will be held jointly and severally liable for all response costs

7

unless it can show there is a reasonable basis for apportionment, while a defendant in a §

113(f) contribution action is liable only for its equitable share of the costs. *See Burlington*

*Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 129 S.Ct. 1870, 1880-81

(2009); 42 U.S.C. § 9613(f)(1).

Section 113(f) itself also provides two avenues of relief. Under § 113(f)(1), a PRP

can seek contribution from another PRP during or following a CERCLA suit brought against

the first PRP. 42 U.S.C. § 9613(f)(1); *see also United States v. Atl. Research Corp.*, 551 U.S.

128, 139 (2007) (explaining that "[s]ection 113(f)(1) authorizes a contribution action to PRPs

with common liability stemming from an action instituted under § 106 or § 107(a)").

Likewise, under § 113(f)(3)(B), PRPs who resolve their liability to the United States or an

individual state through an administratively or judicially approved settlement can seek

contribution from another PRP. 42 U.S.C. § 9613(f)(3)(B); *see also Atl. Research*, 551 U.S.

at 139 n.5 ("Similarly, § 113(f)(3)(B) permits a PRP to seek contribution after it 'has

resolved its liability to the United States or a State . . . in an administrative or judicially

approved settlement . . . .'" (quoting 42 U.S.C. § 9613(f)(3)(B))).

In this case, plaintiffs are essentially pursuing all three avenues of relief. In Count I,

plaintiffs seek to hold defendants jointly and severally liable pursuant to § 107(a)(4) for

response costs related to the AOC plaintiffs entered into with the State of Tennessee. In

Count II, plaintiffs assert that they have paid more than their equitable share of response

costs associated with the § 107(a) action filed against them by the State of Tennessee, which

was resolved through the Consent Decree. In this claim, plaintiffs seek contribution from

8

defendants pursuant to § 113(f)(1) and § 113(f)(3)(B). Plaintiffs also seek a declaratory judgment in Count III pursuant to § 113(g)(2), asking that the Court declare defendants liable for their respective equitable shares of past and future response costs and jointly and severally liable for any and all remediation and response costs.

## B.     Failure to State a Claim

"In order to establish a prima facie case for cost recovery under § 107(a), a plaintiff must prove four elements: (1) the site is a 'facility'; (2) a release or threatened release of a hazardous substance has occurred; (3) the release has caused the plaintiff to incur 'necessary costs of response'; and (4) the defendant falls within one of the four categories of PRPs." *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 347-48 (6th Cir. 1998) (citations omitted). The text of § 113(f)(1) instructs parties seeking contribution under § 113 to look to § 107 to establish the basis and elements of the liability of the defendants. *Id.* at 350.[3] Defendants argue that the TPC fails to allege specific factual allegations in regard to whether there was a release or a threatened release of hazardous substances in relation to the Site that has caused and will cause plaintiffs to incur necessary response costs. Thus, defendants' arguments focus on the second and third elements of plaintiffs' prima facie case.

---

[3]As stated *supra*, unlike § 107, liability under § 113 is not joint and several, but several only. *See Centerior*, 153 F.3d at 348. Section 113 grants the district court discretion to allocate response costs among liable parties. *Franklin Cnty. Convention Facilities Auth. v. American Premier Underwriters, Inc.*, 240 F.3d 534, 549 (6th Cir. 2001).

### 1. A Release or Threatened Release of a Hazardous Substance Has Occurred

Defendants argue that plaintiffs' allegations regarding the generating, stockpiling, and disposing of wastes and slags resulting from the production of ferroalloys, the stockpiling and disposal of baghouse dust, and the fact that the Site was designated an inactive hazardous substances site, coupled with recitations of the time periods of each defendant's ownership and/or operation of the Site [Doc. 9, ¶¶ 17-24], are insufficient to establish plaintiffs' claims that there was a release or a threatened release of hazardous substances during each of the defendants' ownerships or leaseholds of the Site. In response, plaintiffs argue that the TPC alleges sufficiently detailed facts to state CERCLA claims regarding the generating, stockpiling, and discharge of at least two hazardous substances—chromium and lead—and the release or threatened release of these substances. Plaintiffs also contend that the Sixth Circuit imposes no causation requirement in establishing a prima facie case under § 107 of CERCLA, and that plaintiffs' factual allegations that actual releases or threatened releases of hazardous substances occurred throughout the time periods each defendant owned and/or operated the Site are sufficient to state plaintiffs' CERCLA claims.

The Court agrees with plaintiffs that the Sixth Circuit does not impose a causation requirement of the type in which a CERCLA plaintiff must prove that a release or threatened release occurred during a specific PRP's ownership or leasehold. The Court notes, however, that a prima facie case under § 107 is not devoid of considerations of causation. Plaintiffs cite *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648 (6th Cir. 2000)*,* for the

proposition that causation is not an element of liability under § 107. While it is true that the Sixth Circuit stated in *Kalamazoo* that "causation is not an element of liability under § 107[,]" *id.*, 228 F.3d at 656, this statement was in the context of the panel's discussion of causation in regard to the plaintiff's allegations against multiple PRPs for alleged contamination of the plaintiff's site, and one PRP's contention that it was responsible for only a minuscule portion of the alleged contamination. *Id.* In *Kalamazoo*, the Sixth Circuit explained that because § 107 imposes joint and several liability on PRPs, such causation arguments are not relevant to the prima facie case concerning liability. *Id.* at 655-57. The Sixth Circuit noted, however, that these causation arguments are relevant in regard to an affirmative defense or to the amount of damages for which a PRP is liable. *Id.* In sum, the Sixth Circuit confirmed that § 107 still requires a plaintiff to demonstrate "'that defendant's hazardous substances were deposited at the site from which there was a release and that the *release* caused the incurrence of response costs.'" *Id.* at 655 (quoting *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir. 1992)). Given this, the Court agrees with plaintiffs that in order to establish a prima facie case, the TPC need not contain allegations that releases of hazard substances occurred during each of defendants' ownerships or leaseholds of the Site.

This, however, does not end the inquiry on whether plaintiffs have properly alleged a "release" of hazardous substances. As part of Count I, plaintiffs allege that "[t]here has been a 'release' and/or a 'threatened release' of 'hazardous substances' at the [Site] which has caused the incurrence of 'response costs'" by plaintiffs within the meaning of CERCLA

11

[Doc. 9, ¶ 9].  The term "release" is defined in § 101(22) of CERCLA as "spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."  42 U.S.C. § 9601(22).  As support for their claim that there was a "release" or a threatened release of hazardous substances, plaintiffs allege that production of the ferroalloys at the Site from 1956 to about 1982 "produced wastes including various slags which were stockpiled" at the Site, that baghouse dust generated at the Site was "stockpiled," and that chromium was found to have contaminated Cardiff Creek [*Id.*, ¶¶ 17, 18, 29].  Plaintiffs then assert that there were various decommission activities performed at the Site after operations ceased, that the TDHE investigated the Site as a result of a complaint regarding discoloration and high pH in Cardiff Creek, that the owner and/or operator of the Site during the relevant time period discussed plans for remedial actions, that various plans for remedial activities and remedies were later issued, that testing of the surface water and sediment of Cardiff Creek was performed, and that baghouse dust "generated and disposed of" at the Site was tested.

Upon review, the Court concludes that the allegations described above in regard to whether there was a release or threatened release of hazardous substances are sufficient to withstand the standard articulated in *Twombly* and *Iqbal*, that a complaint must contain enough facts to state a claim for relief that is plausible on its face and raise a plaintiffs' right to relief above the speculative level.  *Twombly*, 550 U.S. at 557; *see also Iqbal*, 129 S.Ct. at 1950; *NM Holdings Co., LLC v. Deloitte & Touche LLP*, 622 F.3d 613, 623 (6th Cir. 2010).  Plaintiffs have alleged that there were releases, or discharges, of ferroalloy slags and

12

baghouse dust containing hazardous substances that were produced or generated and stockpiled at the Site. Because there is no requirement that a plaintiff establish, at this stage of the litigation, that the releases of hazardous substances occurred during each of a defendant's ownerships or leaseholds, the Court finds that plaintiffs have sufficiently pled that discharges and/or releases occurred during the time periods plaintiffs allege defendants either owned or operated the Site. Thus, the Court finds that plaintiffs have pled sufficient factual allegations regarding the second element of the prima facie case for purposes of these motions to dismiss.

### 2. Necessary Costs of Response

Defendants also assert that the TPC is devoid of facts regarding plaintiffs' clean-up activities, what response costs were incurred and to what end, whether plaintiffs incurred necessary response costs consistent with the National Contingency Plan (the "NCP"), *see* 42 U.S.C. § 9607(a)(4)(B), and whether there was a threat to human health or the environment that led plaintiffs to incur these response costs. In response, plaintiffs contend that because they have incurred and will continue to incur response costs in accordance with repayment to the State of Tennessee of oversight costs under the Consent Decree and the AOC, there is a presumption that their actions and payment of response costs were and are consistent with the NCP [Doc. 38, p. 18 (citing *Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 136-37 (2d Cir. 2010) and *Franklin Cnty. Convention Facilities Auth.*, 240 F.3d at 544)].

13

As plaintiffs note in the TPC, under CERCLA, "response" is defined as "remove, removal, remedy, and remedial action[,]" including "enforcement actions related thereto." 42 U.S.C. § 9601(25). Thus, the definition of "response" relies on the definitions of "remove" or "removal," and "remedy" or "remedial action." CERCLA defines "remove" or "removal" as:

> [T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). "[R]emedy" or "remedial action" is defined as:

> [T]hose actions consistent with permanent remedy taken instead or of in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect public health and welfare and the environment.

*Id.* § 9601(24). Thus, according to these definitions, in order to sustain a claim under § 107, plaintiffs must have incurred "necessary costs of response," including costs of removal or remedial actions.

Under Sixth Circuit law, investigative costs may be recoverable as long as such costs are necessary and not merely conducted for litigation purposes. For example, the Sixth Circuit has held that "[m]onitoring and evaluation costs may be recovered as 'removal' costs under CERCLA if they were reasonable, and the activities were not scientifically deficient or unduly costly." *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004) (citing *Johnson v. James Langley Operating Co.*, 226 F.3d 957, 963-64 (8th Cir. 2000) and *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1219 (3d. Cir. 1993)); *see id.* at 935 (finding that investigative costs, under certain circumstances, may be recovered as "necessary costs of response"); *see also Ford Motor Co. v. Michigan Consol. Gas Co.*, No. 08-CV-13503-DT, 2010 WL 3419502, at *3-*4 (E.D. Mich. Aug. 27, 2010). For a response cost to be necessary, there must also be some link or nexus between the response cost and some effort to respond to an actual or risk of contamination. *See Johnson*, 226 F.3d at 964 ("Testing and sampling expenses are necessary only if the party seeking to recover costs has an objectively reasonable relief that the defendant's release or threatened release of hazardous substances would contaminate his or her property."). Furthermore, while there is no clear definition of "necessary" costs, the Sixth Circuit has explained that "[g]enerally speaking, legal fees and litigation-related costs 'are not recoverable'; only 'work that is closely tied to the actual cleanup . . . may constitute a necessary cost of response.'"

15

*Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 482 (6th Cir. 2004) (citation omitted). The Sixth

Circuit has also held that "[c]osts are 'necessary' if incurred in response to a threat to human

health or the environment." *Reg'l Airport Auth. of Louisville v. LFG*, 460 F.3d 697, 703 (6th

Cir. 2006) (citations omitted). Conversely, costs incurred at a time when the plaintiff was

unaware of any threat to human health or the environment are not "necessary." *Id.*

While the Court notes that the TPC lacks significant detail regarding the nature of the

response actions for which plaintiffs' allege they incurred response costs under CERCLA,

the Court disagrees with defendants that more specific factual allegations are required at this

stage of the litigation. The elements of a prima facie case under CERCLA do not require

claimants to specifically describe all of their response actions for which they have incur or

will incur costs. *See Centerior*, 153 F.3d at 347-48. Rather, what is required is that plaintiffs

allege that there have been recoverable costs in response to the release of hazardous

substances. After reviewing the factual allegations contained in the TPC, the Court finds that

plaintiffs have done so. Plaintiffs have alleged that they have incurred costs associated with

removal and remedial actions, including investigatory actions relating to complaints of

contamination in Cardiff Creek, the issuing of remedial plans regarding actions for

wastewater disposal and stabilization of on-site materials, and testing, site characterization

reports, remedial actions after the Site was put on an inactive hazardous substances site list,

and remedial and response activities associated with the ROD, the AOC, and the Consent

Decree. *See* 42 U.S.C. § 9601(23) (stating that removal costs and remedial action may

include "such actions as may be necessary to monitor, assess, and evaluate the release or

16

threat of release of hazardous substances"). While plaintiffs have not alleged that such actions were taken as a response to either a threat to human health or the environment, the factual allegations in the TPC that hazardous substances such as lead and chromium were released on the Site through the discharge of baghouse dust, and into the waters of Cardiff Creek, are sufficiently plausible to establish the third element of plaintiffs' prima facie case under CERCLA for purposes of these motions to dismiss. *See, e.g.*, *Ford Motor Co. v. Michigan Consol. Gas Co.*, No. 08-CV-13503-DT, 2011 WL 1743735, at *3-*5 (E.D. Mich. May 5, 2011) (discussing amended allegations regarding "necessary costs" pursuant to a CERCLA claim that are sufficient to state a claim for relief).

Thus, for the reasons given, defendants' requests for dismissal of plaintiffs' CERCLA claims for failure to state a claim are **DENIED**.

### C. Cost-Recovery Claim Pursuant to § 107(a) of CERCLA

In addition to arguing that plaintiffs have failed to state a claim under CERCLA, defendants also move for dismissal to the extent plaintiffs seek to hold defendants jointly and severally liable for past and future response and remediation costs associated with the AOC and pursuant to § 107(a). Because plaintiffs incurred the response costs alleged in Count I pursuant to an administrative settlement—the AOC—defendants assert that § 113(f)(1) and § 113(f)(3)(B) provide plaintiffs' exclusive remedy.

Defendants begin their argument by citing *Atl. Research*, 551 U.S. 128, in which the United States Supreme Court overruled lower court precedent holding that PRPs could never have a claim under § 107(a), and clarified that § 107(a) may provide PRPs "with a cause of

17

action to recover costs from other PRPs." *Id.* at 131. In reaching this conclusion, the Supreme Court reiterated that § 107(a) and § 113(f) "provide two 'clearly distinct' remedies" which "complement each other by providing causes of action to persons in different procedural circumstances." *Id.* at 138-39 (citation and internal quotes omitted). The Supreme Court explained that a PRP that incurs response costs directly may have a cause of action against another PRP pursuant to § 107(a); but a PRP that simply reimburses response costs paid by other parties "has not incurred its own costs of response and therefore cannot recover under § 107(a)." *Id.* at 139. The Supreme Court expressly noted that while a PRP incurring reimbursement costs would be eligible to seek contribution pursuant to § 113(f), it could not "simultaneously seek to recover the same expenses under § 107(a)." *Id.* Noting that a PRP in that situation "could not avoid § 113(f)'s equitable distribution of reimbursement costs among PRPs by instead choosing to impose joint and several liability on another PRP in an action under § 107(a), the Supreme Court observed that this "choice of remedies simply does not exist." *Id.* at 140.

Plaintiffs and defendants both recognize, however, that *Atl. Research* did not answer the precise question before the Court in this case—whether PRPs like plaintiffs who enter into an administrative consent order with a state to perform response and remedial activities at a site have a claim against other PRPs pursuant to § 107(a), or whether those PRPs are limited to claims for contribution against liable PRPs pursuant to § 113(f)(1) and § 113(f)(3)(B). Complicating this issue is the Supreme Court's statement in *Atl. Research* that:

We do not suggest that § § 107(a)(4)(B) and 113(f) have no overlap at all. For instance, we recognize that a PRP may sustain expenses pursuant to a consent decree following a suit under § 106 or § 107(a). In such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party. We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both. For our purposes, it suffices to demonstrate that costs incurred voluntarily are recoverable only by ways of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f). Thus, at a minimum, neither remedy swallows the other[.]

*Id.* at 139 n.6.

Although the Sixth Circuit has yet to rule on this issue in the wake of *Atl. Research*, several other federal appellate courts have done so, with the majority holding that § 107 is not an available remedy when a PRP directly incurs "compelled" cleanup costs pursuant to a consent decree or a settlement agreement with a governmental entity.[4] *See, e.g., Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 227-28 (3d Cir. 2010); *Niagara*, 596 F.3d at 124; *Solutia, Inc. v. McWane, Inc.*, 726 F. Supp. 2d 1316, 1341-42 (N.D. Ala. 2010) (citing *Agere*, *Niagara*, and several other cases which hold that a §113(f) contribution claim is the

---

[4]The Sixth Circuit came close to addressing this issue in *ITT Indus.*, 506 F.3d 452. In *ITT Indus.*, the plaintiff entered into a consent decree with the state and an administrative consent order with the Environmental Protective Agency (the "EPA"), in respect to a hazardous site. *Id.* at 455. Both the consent decree and the administrative order required the plaintiff to perform certain response activities and incur substantial costs. *Id.* The plaintiff sued a number of PRPs pursuant to both § 107(a) and § 113(f)(3)(B). *Id.* The district court dismissed both CERCLA claims and the plaintiff appealed. *Id.* at 456. On appeal, the Sixth Circuit affirmed the district court's dismissal of the plaintiff's contribution claim pursuant to § 113(f)(3)(B), but reversed the district court's dismissal of the plaintiff's cost-recovery claim pursuant to § 107(a), remanding that issue for further proceedings in light of *Atl. Research*. *Id.* at 458. The Sixth Circuit stated expressly, however, that "[w]e express no opinion as to how Plaintiff's cost recovery action ultimately should be resolved. Rather, we leave it to the district court to entertain this question in light of *Atlantic Research*." *Id.*

19

exclusive remedy for a PRP who incurs compelled cleanup costs pursuant to a judgment, a consent decree, or a settlement agreement, and citing several district court which hold to the contrary).

Here, plaintiffs do not dispute that the response costs they incurred arising out of the Consent Decree [Doc. 7] with the State of Tennessee may not be brought pursuant to a § 107(a) claim. Plaintiffs argue, however, that because the State of Tennessee chose to enter into the AOC with respect to remedial activities undertaken at the Site, in addition to the Consent Decree with respect to repayment of the State's oversight costs, plaintiffs have *both* a § 107(a)(4) cost-recovery claim for costs arising out of activities they voluntarily incurred *and* will incur under the AOC, and a contribution claim under § 113(f)(1) and § 113(f)(3)(B) for costs they have incurred and will incur under the Consent Decree. Plaintiffs also argue that nothing in the TPC or the AOC suggests that plaintiffs were subject to a CERCLA action pursuant to a § 106 or a § 107 suit when they voluntarily performed the response and remedial activities before and after entering into the AOC. Thus, plaintiffs assert, this case illustrates the exact procedural circumstances identified in *Atl. Research* which require "two 'clearly distinct' remedies[.]" *Id.*, 551 U.S. at 138-39.

Notwithstanding plaintiffs' arguments to the contrary, this Court finds the Third Circuit's decision in *Agere* particularly persuasive. In *Agere*, the plaintiffs sought cost-recovery and contribution claims against the defendants pursuant to § 107(a) and § 113(f) to recover costs the plaintiffs had paid to the EPA pursuant to consent decrees. *Agere*, 602 F.3d at 210. The Third Circuit found that the plaintiffs' claims fell squarely within the issue left

20

open in *Atl. Research*. *Id.* at 227-28. That is, whether in addition to § 113(f) contribution claims, the plaintiffs had § 107(a) claims for expenses sustained pursuant to a consent decree following a CERCLA suit. *Id.*

In analyzing *Atl. Research*, the *Agere* court stated that after the Supreme Court noted some "overlap" between § 107(a) and § 113(f), the Supreme Court stated that "'a defendant PRP in such a § 107(a) [joint and several liability] suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim.'" *Id.* (quoting *Atl. Research*, 551 U.S. at 140). The Supreme Court then explained that "any fear that 'PRPs will eschew equitable apportionment under § 113(f) in favor of joint and several liability under § 107(a)' is mitigated by the fact that 'a § 113(f) counterclaim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action.'" *Id.* (quoting *Atl. Research*, 551 U.S. at 138, 140). In *Agere*, the Third Circuit found "the potential for an inequitable result" remained in that case because the defendants would have been precluded by virtue of § 113(f)(2) from bringing a § 113(f) counterclaim against the plaintiff. *Id.* at 228. Section 113(f)(2) states that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." *Id.* (quoting 42 U.S.C. § 9613(f)(2)). In *Agere*, because the defendants would have been barred from bringing a contribution counterclaim due to the fact that the plaintiffs had entered into judicially approved settlements with the EPA, the plaintiffs would have been "able to recover 100 percent of their own costs against [the defendant], even though they

21

themselves [were] actually responsible for, and ha[d] stipulated that they [were] responsible for, a significant portion of the contamination" at the site. *Id.* The *Agere* court found this potential result to be "perverse" because "a primary goal of CERCLA is to make polluters pay[,]" and held that parties such as the plaintiffs who, "if permitted to bring a § 107(a) claim would be shielded from contribution counterclaims under § 113(f)2), do not have any § 107(a) claims for costs incurred pursuant to consent decrees in a CERCLA suit." *Id.* at 229.

In this case, plaintiffs have limited their § 107(a) claim to costs incurred in connection with the AOC plaintiffs entered into with the State of Tennessee [Doc. 38, p. 10]. The terms of the AOC expressly state, however, that the AOC is an administrative settlement under CERCLA within the meaning of § 113(3)(B):

> The entry of this Consent Order shall constitute resolution of [plaintiffs'] liability in an administrative settlement pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613, and any other applicable provisions of CERCLA or other federal or state law, for matters addressed in this Consent Order.

[Doc. 15-1, p. 27].[5] Furthermore, in a section titled "Effect of Settlement: Contribution Protection," the AOC provides plaintiffs with contribution protection:

> [A]gainst all other persons and entities regardless of whether such persons and entities are Parties to [the AOC] or parties to this action. TDEC is aware that potential third parties to this action exist, and TDEC agrees that this conferral of contribution protection on [plaintiffs] is in the public interest.

---

[5]The Consent Decree entered by this Court also references the AOC [Doc. 7, p. 2].

22

[*Id.*, pp. 26-27]. *See* 42 U.S.C. § 9613(f)(2) ("A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding the matters addressed in the settlement."). Thus, like in *Agere*, plaintiffs are protected from contribution counterclaims by virtue of § 113(f)(2) and the terms of the AOC. This means that if plaintiffs were permitted to pursue § 107(a) claims for joint and several liability against defendants, defendants would be precluded from pursuing § 113(f) counterclaims against plaintiffs. Despite the fact that the CERCLA agreements at issue in *Agere* were consent decrees, and the agreement at issue here is the AOC, the Court does not find the different nature of the agreements to warrant a different result because the concern of the *Agere* court, that a party is being shielded from a contribution counterclaim under § 113(f)(2) because of a prior agreement pursuant to CERCLA, is present here as well. *See Agere*, 602 F.3d at 229-30; *see also Stimson Lumber Co. v. Int'l Paper Co.*, No. CV 10-79-M-DWM-JCL, 2011 WL 1532411 (D. Mont. Feb. 28, 2011).

Plaintiffs cite *United States v. Pharmacia Corp.*, 713 F. Supp. 2d 785 (S.D. Ill. 2010) for the proposition that PRPs who have voluntarily entered into an administrative consent order to perform remedial activities at a site have a § 107(a) claim against other PPRs under CERCLA. The Court, however, finds the facts of *Pharmacia* distinguishable from this case. In *Pharmacia*, in which there had been a prior § 107(a) lawsuit brought by the United States against the plaintiffs, a prior settlement agreement which resolved various § 107(a) costs, and a partial consent decree in regard to several parties, the district court permitted the plaintiffs

23

to amend their complaint to assert claims under § 107(a) for cost-recovery actions. *Id.* at 789-91. The district court permitted the amendments over the defendants' objections based on *Atl. Research*, but only after noting that the plaintiffs' proposed claims were "to recover response costs which were neither derivative of, nor co-extensive with the United States costs; in other words, expenses that were allegedly *different* from those sought" in the prior proceedings. *Id.* at 790. Thus, the district court found that the plaintiffs were seeking direct costs that were beyond the scope of the prior CERCLA proceedings. *Id.* at 790-91. *See also Ford Motor Co. v. Michigan Consol. Gas Co.*, No. 08-CV-13503-DT, 2009 WL 3190418, at *7-*8 (E.D. Mich. Sept. 23, 2009) (finding that the plaintiffs could pursue a claim for their own direct response costs under § 107(a) after finding that the state administrative order at issue did not constitute an administrative settlement under CERCLA and the plaintiffs could not maintain a § 113(f) claim).

Unlike this case, in *Pharmacia*, there was no indication of an administrative consent order constituting an administrative settlement agreement under CERCLA, and no indication that the plaintiffs could also bring contribution claims under § 113(f)(3)(B). Here, there is both—the AOC which constitutes an administrative settlement under CERCLA, and the availability of contribution claims under § 113(f)(3)(B) [Doc. 15-1; Doc. 9, ¶ 63]. Furthermore, as defendants point out, plaintiffs seem to ignore that they have a contribution remedy under § 113(f)(3)(B) for costs they allegedly incurred during response activities in connection with the AOC [Doc. 9, ¶ 63]. 42 U.S.C. § 9606 (f)(3)(B) (providing a contribution remedy to a party who enters into an administratively approved CERCLA

24

settlement with a State).  *See also ITT Indus., Inc. v. BorgWarner, Inc.*, 615 F. Supp. 2d 640 (W.D. Mich. 2009) (stating that when a party has been the subject of a CERCLA enforcement action and can assert a claim under § 113(f), that party cannot also assert a claim under § 107(a)); *Stimson Lumber* 2011 WL 1532411, at *19 (holding that because the plaintiff had a cause of action under § 113(f), it could not maintain an action under § 107).

Accordingly, and in light of the foregoing, the Court finds that § 113(f) constitutes plaintiffs' exclusive remedy under CERCLA and therefore, the motions to dismiss are **GRANTED in part**, to the extent plaintiffs seek to hold defendants jointly and severally liable for cost-recovery claims and declaratory relief under § 107(a) of CERCLA.

### D.  Statute of Limitations

UCC argues that plaintiffs' § 113(f) contribution claims are barred by the statute of limitations contained in § 113(g)(3) because the TPC is devoid of allegations claiming that plaintiffs entered into a judicially approved settlement or were subject to a judgment for response costs they sustained as part of the cleanup activities alleged to have taken place in the late 1980s and early 1990s, the time period of UCC's ownership and /or operation of the Site.  Plaintiffs respond that both the AOC and the Consent Decree were executed in 2009, less than two years before the TCP was filed in February 2011, and therefore any dismissal based on UCC's argument regarding the statute of limitations is inappropriate.

The Court agrees with plaintiffs.  Section 113(g)(3) provides that:

> No action for contribution for any response costs may be commenced more than 3 years after -- (A) the date of judgment in any action under this chapter for recovery of such costs or damage, or (B) the date of an

25

> administrative order under section 9622(g) of this title . . . or entry of
> a judicially approved settlement with respect to such costs or damages.

42 U.S.C. § 9613(g)(3). The clear language of this provision is that the three-year statute of limitations for contribution claims begins to run when a court enters a judicially approved settlement or the date of an administrative order, not when the activities related to the recovery of costs or damages occurred. *See Detrex Corp. v. Ashland Chem. Co.*, No. 01-CV-71201, 2002 WL 32351496, at *4 (E.D. Mich. May 23, 2002). Thus, because there appears to be no dispute that the Court entered a judicially approved Consent Decree in December 2010, and plaintiffs and the State of Tennessee entered into the AOC in June 2009, the Court finds that UCC's statute of limitations argument not well-taken. Thus, UCC's request for dismissal of plaintiffs' claims against it due to the statute of limitations contained in § 113(g)(3) is **DENIED**.

## IV. Conclusion

For the reasons stated herein, MeadWestvaco's motion to dismiss [Doc. 14], UCC's motion to dismiss [Doc. 24], and Citigroup's motion for partial dismissal [Doc. 27] are **GRANTED in part**, to the extent plaintiffs seek to hold defendants jointly and severally liable for cost-recovery claims and declaratory relief under § 107(a) of CERCLA. The motions are **DENIED** in all other respects.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE